FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 11, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

EVANS FRUIT CO., INC., a
Washington Corporation; WGE
HOLDINGS, LLC, a Washington
Limited Liability Company;
McDOUGALL FAMILY FARMING,
INC., a Washington Corporation;
McDOUGALL & SONS, INC., a
Washington Corporation; DOUBLE S
ORCHARDS, LLC, a Washington
Limited Liability Company;
COLUMBIA FRUIT PACKERS,
INC., a Washington Corporation;
COLUMBIA ORCHARD
MANAGEMENT, INC., a Washington
Corporation; and WADE & WADE,
LLC, a Washington Limited Liability
Company,

                    Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
LABOR; PATRICK PIZZELLA, in his
official capacity as Acting United States
Secretary of Labor; JOHN P.
PALLASCH, in his official capacity as
Assistant Secretary of Labor,
Employment & Training
Administration, United States
Department of Labor; CHERYL M.
STANTON, in her official capacity as
Administrator of the Wage & Hour

No.   1:19-cv-03202-SMJ

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Division, United States Department of Labor;

                    Defendants,

and

STATE OF WASHINGTON
EMPLOYMENT SECURITY
DEPARTMENT;

                    Defendant-Intervenor.

On October 9, 2019, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction, ECF No. 15. At the conclusion of the hearing, the Court took the matter under submission. For the reasons that follow, the Court now denies Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

Plaintiffs are eight Washington-based apple growers. ECF No. 1 at 6–8. Plaintiffs assert that their crops "are virtually exclusively picked by hand laborers." *Id.* at 15. As the result of a persistent shortage of domestic agricultural laborers, Plaintiffs and other Washington growers hire a significant number of non-immigrant foreign laborers under the so-called "H-2A program." *Id*. at 15. This program authorizes short-term visas for qualifying individuals "having a residence in a foreign country which [they have] no intention of abandoning who [are] coming temporarily to the United States to perform agricultural labor or services." 8 U.S.C.

§ 1101(a)(15)(H)(ii)(a); *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 387, 382 (D.C. Cir. 2018).

To ensure that incoming H-2A laborers do not depress the wages of United States citizens, federal law requires employers who hire H-2A laborers to pay the highest of four possible wages: the adverse effect wage rate (AEWR), any collectively-bargained wage, the applicable state or federal minimum wage, or the prevailing hourly or piece wage rate (PWR). 20 C.F.R. § 655.120(a).

## A. The PWR

The PWR, which is at issue in this case, is intended to reflect the average, i.e. "prevailing," wage paid to domestic agricultural laborers, who are engaged in a crop activity like apple harvesting, within a given agricultural region. 29 C.F.R. § 502.10(a). The United States Department of Labor ("DOL")—which administers the H-2A program—sets the PWR. The applicable regulations, however, expressly delegate the task of calculating the PWR to "state workforce agencies," (SWAs) such as Washington's Employment Security Department (ESD). *Id.* The SWAs receive grant funds to survey employers and employees, collect wage data, and calculate what they believe to be the PWR. *See* ECF No. 29 at 3. The SWAs then submit their results to DOL, which reviews the information and "determines whether the survey results may be validated." *Id.* at 5. If so, the PWR is published, and H-2A employers must pay it immediately, even if the change comes mid-

harvest.[1] ECF No. 1 at 44.

The dispute in this case centers on the process an SWA must follow in conducting the required wage survey. *See* 29 C.F.R. § 502.10. The parties agree that a DOL publication known as "Handbook 385," is the relevant source of authority.[2] ECF No. 15 at 5; ECF No. 31 at 5. Handbook 385 is not, however, a model of clarity or precision. For example, it requires SWAs to ensure "that the planned [wage] sample will yield data which will be representative of the wage rates paid in the [specified] crop activity." ECF No. 30-3 at 4. To that end, it refers SWAs to a "general guide" of minimum sampling requirements—for instance, when a crop activity employs 3000 or more workers in a given area, Handbook 385's "general guide" provides for a 15% minimum sample size. *Id.* The Handbook also dictates that the wage sample "should include workers of small, medium and large employers" and states that SWAs should employ "probability sampling methods"

---

[1] An H-2A employer notified of an increased PWR must pay the new rate immediately. 20 C.F.R. § 655.120(b). Moreover, besides filing a lawsuit like this one, an aggrieved H-2A employer has no recourse to challenge the PWR. *Id.*

[2] The parties agree that Handbook 385 is binding on SWAs in conducting prevailing wage surveys, and this is consistent with DOL's statements outside this litigation. *See* 84 Fed. Reg. 36168 ("Currently, the SWAs are required to conduct prevailing wage surveys using standards set forth in Handbook 385."). They disagree, however, about whether several requirements imposed by Handbook 385 are mandatory or permissive. *Compare* ECF No. 40 at 9 (characterizing 15% sample-size threshold as a "*mandatory* parameter[]") *with* ECF No. 31 at 7 (characterizing the same threshold as a "general guide" (quoting ECF No. 30-3 at 4)).

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 4

which the Handbook does not prescribe. *Id.* The Handbook also requires wage surveys to be conducted using a "substantial number" of in-person employer interviews, but qualifies that under "certain conditions, employer contacts by mail or by telephone may be made" so long as "the [SWA] assure[s] itself that information gathered in this manner is representative." *Id.* at 6. It is silent, however, as to the "certain conditions" under which this exception may apply. *Id.*

### 1. PWR for Apples in Washington

DOL first set an hourly PWR for apples in Washington in 2017, and only then for honeycrisp apples, for which H-2A employers were required to pay $15.00/hr. ECF No. 1 at 137. In 2018, no hourly PWR for apples was established. *Id.* at 141. In 2019, prior to the notice of increase at issue here, the hourly PWR was still only $15.00/hr. for honeycrisp apples, but a $15.03/hr. AEWR[3] was in effect. *Id.* at 13; 83 Fed. Reg. 66307. As such, when Plaintiffs applied to hire H-2A laborers for the 2019 apple harvest, each agreed to pay at least $15.03/hr., and DOL approved their applications on that condition. *See, e.g.,* ECF No. 29-13 at 3. Critically, Plaintiffs agreed that "if the [PWR] is adjusted during a work contract . . . [each] must pay . . . that higher [PWR] upon notice" from DOL. ECF No. 29-12 at

---

[3] The AEWR represents a "wage floor" designed "to ensure that the wages of similarly employed U.S. workers will not be adversely affected," and is not tied to a particular commodity. 29 C.F.R. § 502.10; *AFL-CIO v. Dole*, 923 F.2d 182, 184 (D.C. Cir. 1991). In this case, it is the increased PWR that is challenged, and so the technical differences between that figure and the AEWR are unimportant.

2. On July 24, 2019, DOL sent just such a notice, informing Plaintiffs that the PWR for high-density[4] apple harvesting had been set at $16.00/hr. ECF No. 1 at 44–45. The focus of this litigation is the way DOL arrived at that figure.

## 2. The 2019 PWR Survey

The 2019[5] PWR survey, from which the $16.00/hr. PWR was derived, was conducted by ESD using an online survey, telephone calls, and forms sent through the mail.[6] ECF No. 30 at 10–11. Before and after the survey was conducted, ESD met with stakeholders in the Washington agricultural community. ECF No. 30 at 6, 23–25. At those meetings, ESD previewed the survey form it planned to use, and later reviewed the PWRs it had calculated. *Id.* Though invited to do so, none in attendance voiced concerns with the form of the survey or the resulting PWRs. *Id.* at 24–25.

Joshua Moll, an economist at ESD, oversaw the 2019 survey and calculated

---

[4] "High density" is defined as apple harvesting in orchards with more than 800 trees per acre. ECF No. 1 at 120. Plaintiffs challenge two PWRs—one for high-density apple harvesting and one for "harvesting-color-picking," which is defined as "selectively harvesting fruit based on color or maturity." *Id.* Because both PWRs were set at $16.00/hr., unless otherwise noted, the Court's refers to both interchangeably.

[5] Although the survey data used to calculate the PWR at issue here was collected between October 2018 and January 2019, the Court refers to this as the "2019 survey" for convenience. ECF No. 30 at 7.

[6] ESD interviewed farm laborers in-person, but the information it gathered was not used in setting the PWR. ECF No. 30 at 10.

the resulting PWRs. *Id.* at 1. Mr. Moll applied statistical models to first estimate the number of apple growers with high-density orchards and then extrapolated to an estimate that 11,895 laborers were employed in high-density apple harvesting during the season's most active week. *Id.* at 19. Responses to ESD's survey included wage information representing 1745 of those laborers, or 14.67% of the estimated total.[7] *Id.* at 19. Once the survey period closed, ESD used the method prescribed by Handbook 385 to calculate that the new prevailing wage rate for high-density apple harvesting was $16.00/hr. *Id.* at 20–21. ESD then reported its findings to DOL. *Id.* at 24–25. A DOL analyst confirmed that the sample size of ESD's survey was adequate, confirmed ESD's calculation of the PWRs from the survey data, and published the results. ECF No. 29 at 8. On July 24, 2019, prior to the start of the apple harvest, DOL informed Plaintiffs that the PWR had increased, and that they would be required to pay the new rate immediately. *Id.* at 7–8.

### 3. Plaintiffs' Claims

Plaintiffs contend that DOL's decision to certify the increased PWR was arbitrary and capricious and should therefore be set aside. ECF No. 1 at 20–35. Plaintiffs make three arguments that ESD reached an inaccurate result and failed to conduct the 2019 wage survey in accordance with Handbook 385. ECF No. 15 at

---

[7] Mr. Moll relied on the same methodology to estimate that there were 7728 workers employed in color-picking harvesting, and collected wage data for 1200 of them, or 15.52% of the estimated total. ECF No. 30 at 20–21.

8–11. The Court briefly summarizes each of Plaintiffs' arguments in turn.

### a.  Unrepresentative PWR

Plaintiffs first argue that the $16.00/hr. PWR for high-density apple harvesting is unrepresentative of what Washington growers actually pay. ECF No. 15 at 8. They attempt to substantiate this claim with declarations from Washington growers—which Plaintiffs assert in the aggregate represent roughly 75% of the state's production by tonnage—most of which state they do not pay $16.00/hr. *See, e.g.*, ECF No. 16-2 at 3 ("In 2018, the hourly wage rate paid by [Columbia Orchard Management, Inc.] for harvest of apples, excluding Honeycrisp was $14.12 per hour. In 2018, the hourly wage rate paid [] for harvest of Honeycrisp was $15.00/hr."). Plaintiffs claim that "[t]his alone shows a strong likelihood of success on the merits." ECF No. 15 at 8.

### b.  Handbook 385

Plaintiffs also argue that ESD deviated from the guidelines set out in Handbook 385 in two ways.

### i.  Failure to Sample 15% of Worker Population

Plaintiffs contend that the PWR for high-density apple harvesting was calculated based on a sample size "*below* the 15% threshold" set out by Handbook 385. ECF No. 15 at 9. ESD estimated that the 1745 domestic workers for which it collected wage data represented 14.67% of the labor force and rounded up to report

a sample size of 15% when it published the survey results. ECF No. 30 at 19; ECF No. 1 at 105.

Plaintiffs also contend that ESD's use of inappropriate statistical models could have resulted in a dramatic underestimate of the domestic workforce and thus that its sample may have represented far less than 15% of the population. ECF No. 15 at 9; ECF No. 40 at 7. Plaintiffs argue that ESD should have instead calculated what percentage of the state's apple crop each responding employer represented, which Plaintiffs claim would have resulted in a more reliable estimate of the sample size. *Id.*

### ii.    Failure to Conduct In-Person Interviews

In their reply brief, Plaintiffs argued for the first time that ESD's failure to conduct in-person interviews rendered the PWR unreliable and DOL's certification of it arbitrary and capricious. ECF No. 40 at 10.  This issue was not raised in Plaintiffs' original motion for a preliminary injunction, ECF No. 15. However, the argument does appear in Plaintiffs' complaint. *See* ECF No. 1 at 33–35. Thus, notwithstanding the general rule that the Court "need not consider arguments raised for the first time in a reply brief," the Court will evaluate the merit of this claim. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

//

//

# LEGAL STANDARD

## A.    Standard for Preliminary Relief

To obtain preliminary injunctive relief, the moving party must show (1) a likelihood of success on the merits; (2) that irreparable harm is likely if preliminary relief is denied; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, the movant may also obtain a preliminary injunction by showing that there are "serious questions going to the merits"—a less demanding showing than likelihood of success on the merits—in cases where the balance of equities tips "sharply" in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## B.    Standard Under the Administrative Procedures Act

Under the Administrative Procedures Act (APA), the Court must invalidate "agency action, findings, and conclusions" that are "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> Review under the arbitrary and capricious standard is narrow, and [the Court does] not substitute [its] judgment for that of the agency. Rather, [it] will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). The Court's deference is greatest when evaluating "an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *Id.* Moreover, agency action is not arbitrary and capricious simply because it relies on a "dataset [that] was less than perfect." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015). And under the APA, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

However, "[a]n agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable, separate and apart from adoption of the regulation itself." *Acosta*, 901 F.3d at 387. Thus, while a plaintiff cannot prevail simply by showing that the agency reached an imperfect conclusion, if the agency consistently followed a "general policy by which its exercise of discretion will be governed, an irrational departure from that policy," rather than "an avowed alteration of it" may be arbitrary and capricious independent of the result the agency reached. *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

# DISCUSSION

## A.  Plaintiffs Are Not Entitled to a Preliminary Injunction

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citing *Winter*, 555 U.S. at 20, 24). This is particularly true in the case at bar, where Plaintiffs marshal only limited evidence in support of their claims. Although this limited showing might be sufficient if Plaintiffs could establish that the equities tip *sharply* in their favor, the Court finds that they have failed to do so. *All. for the Wild Rockies*, 632 F.3d at 1132. Accordingly, because Plaintiffs have failed to establish likelihood of success on the merits, the Court denies the motion for a preliminary injunction.

### 1.  Balance of Equities

The balance of equities does not tip sharply in Plaintiffs' favor. The parties devote substantial argument to comparing the facts of this case to those in a related matter in which the Court recently granted preliminary injunctive relief, *Zirkle Fruit Co. v. U.S. Dep't of Labor, et al.*, Case No. 1:19-cv-03180-SMJ, ECF No. 49. Plaintiff in that matter, a Washington blueberry grower, was notified of a 50% increase in the applicable PWR in the seventh week of a fifteen-week blueberry harvest. *Id.* at 5. The Plaintiff credibly contended that, were the increased PWR

enforced, it would result in $1,400,000 in virtually unrecoverable labor costs to its business alone. *Id.* at 22. The Court concluded, based on the "remarkable" facts of that case, that the equities tipped "sharply" in the Plaintiff's favor. *Id.* at 21. For that reason, and because the Plaintiff had established "serious questions going to the merits," the Court granted the requested preliminary injunction. *Id.* at 21, 24.

To some extent, the equities of this case are similar to those in the *Zirkle* matter. For one, Plaintiffs in both cases challenge similar administrative action—DOL's certification of PWRs calculated by ESD using the same prevailing wage survey. *See id.* at 6–10; ECF No. 30 at 8–10. Moreover, there is significant overlap between the claims presented in both cases. *Id.* And like the Plaintiff in the *Zirkle* matter, Plaintiffs in this case stand little chance of recovering the wages at issue once paid to their non-immigrant foreign employees. *Id.* at 14.

But there are important—indeed, dispositive—differences between the equities of this case and those in the *Zirkle* matter. First and most significant is the magnitude of the challenged PWR increase. The Plaintiff in the *Zirkle* litigation challenged a 50% increase in the PWR, while in this case Plaintiffs face only a 6.5% increase. By way of comparison, farmworker wages nationwide increased 7% between 2018 and 2019, and field worker wages grew by 8% during the same period. *See Farm Labor*, U.S. Dep't of Agric. Econ. Research Serv. 3 (2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/ks65hn7

6b/7h14b065g/fmla0519.pdf. Although this data cannot disprove Plaintiffs' substantive claims, it is relevant to the Court's task of weighing the equities. Additionally, the increased PWR for high-density apples was announced prior to the beginning of the harvest, whereas in the *Zirkle* litigation, Plaintiff challenged a mid-harvest increase. *See Zirkle Fruit Co.*, Case No. 1:19-cv-03180-SMJ, ECF No. 49 at 5; *see also* ECF No. 15 at 3. Plaintiffs then waited nearly two months to seek preliminary relief. In light of the foregoing, the Court finds that Plaintiffs have not shown the equities tip sharply in their favor.

### 2. Likelihood of Success on the Merits

As set out above, the Court concludes that the equities in this matter do not sharply favor Plaintiffs. They must therefore establish a "likelihood of success on the merits" of their arguments that DOL's certification of the increased PWR for high-density apple harvesting was arbitrary and capricious. *All. for the Wild Rockies*, 632 F.3d at 1135. For the reasons that follow, the Court concludes that they have failed to do so.

### a. Inaccurate PWR

Plaintiffs' first claim, that the PWR for high-density apple harvesting is unrepresentative of the wages actually paid by Washington growers, is insufficient. To substantiate this claim, Plaintiffs provide declarations of numerous Washington apple growers, the lion's share of which assert they do not pay $16.00/hr. for high-

density apple harvesting. *See, e.g.,* ECF No. 16-2 at 63 ("At no point in 2018 did [Columbia Orchard Management, Inc.] pay $16.00 (or more) per hour as an hourly wage for the harvest of apples."). Plaintiffs assert that "[t]his alone shows a strong likelihood of success on the merits." ECF No. 15 at 8.

Under the APA, the Court may not set aside the PWR simply because DOL or ESD "relied on a "dataset [that] was less than perfect." *Burwell*, 786 F.3d at 61. Rather, Plaintiffs bear the burden of showing that DOL's certification of the PWR "r[an] counter to the evidence before the agency or [was] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Allen*, 615 F.3d at 1130 (quoting *McNair*, 537 F.3d at 987). The Court also notes that most of the declarations on which Plaintiffs rely state that in 2018, growers paid $15.00/hr. for the honeycrisp harvest, and $14.12/hr. for all other apple harvesting. *See, e.g.*, ECF No. 16-2 at 3. These figures are—the Court presumes not coincidentally—the PWR and AEWR in effect during the 2018 harvest when Plaintiffs received clearance orders to hire H-2A laborers. *See* ECF No. 1 at 137; 82 Fed. Reg. 60629. Thus, this evidence is most easily interpreted to mean that Plaintiffs agreed to pay as little as legally permissible during the 2018 harvest, and not, as Plaintiffs seem to suggest, that these rates were reflective of what the labor market would bear. ECF No. 15 at 7. Thus, while this evidence may help to inform the Court's ultimate conclusion that DOL acted in an arbitrary or capricious manner,

standing alone it is inadequate to show that Plaintiffs are likely to succeed on the merits.

### b.    Failure to Sample 15% of the Workforce

Neither of Plaintiffs' arguments that ESD relied on an inadequate sample of workers engaged in high-density apple harvesting establishes likelihood of success on the merits. Plaintiffs first argue that ESD's 14.67% sample size did not conform with the requirements of Handbook 385. ECF No. 30 at 14, 19. Handbook 385 dictates that when more than 3000 domestic workers are engaged in a given crop activity, as a "general guide," a prevailing wage survey should include data representing at least 15% of that population. ECF No. 30-3 at 4. The Court reads this provision to mean that the 15% threshold prescribed by Handbook 385 is not an absolute floor, anything less than which results in an invalid PWR, but rather an approximate guideline. And even if the 15% threshold was an absolute minimum, Plaintiffs have failed to establish that DOL and ESD's practice of rounding to the nearest whole number—in this case, from 14.67% to 15%—is an arbitrary or capricious deviation from the Handbook's provisions. *See* ECF No. 30 at 19.

Plaintiffs also argue that the wage information collected by ESD could have represented far less than 15% of the relevant labor force because ESD underestimated the total population—in other words, that the denominator in ESD's sample size calculation was wrong. ECF No. 40 at 7. In support of this argument,

Plaintiffs provide declarations of Stephen Bronars, Ph.D, an economist. *See* ECF Nos. 17, 42. Dr. Bronars opines that ESD's calculation of the relevant labor force is a "lower bound" estimate, meaning that "the survey covers no more than 14.67 to 15.53% of the relevant population of workers." ECF No. 17 at 6. Dr. Bronars further opines that the statistical models employed by ESD were unreliable and could have resulted in a substantial underestimation of the workforce. *Id.* at 5–13.

Plaintiffs cannot prevail simply by showing that ESD relied on imperfect data or used an imperfect approach in evaluating the adequacy of its sample size. *Dist. Hosp. Partners, L.P.*, 786 F.3d at 61. Plaintiffs do not contend that ESD failed entirely to apply a "probability sampling method[]" in conducting the wage survey, but instead argue that its chosen methods were unreliable. ECF No. 40 at 8; ECF No. 30-3 at 4. Notably, although Dr. Bronars devotes significant argument to criticizing ESD's approach, he nowhere proposes an alternative. *See generally* ECF Nos. 17, 42. And for his part, Mr. Moll asserts that the models he applied were suitable to the task of estimating the size of the workforce. ECF No. 30 at 17–20. Plaintiffs independently assert that relying on tonnage would be "a mechanism to obtain a more reliable estimate of the relevant workforce than the unreliable estimation methodologies used by ESD," but cite no authority for this proposition, which they simply label "intuitive." ECF No. 40 at 7. Nor do Plaintiffs make any attempt to tie this tonnage-based approach to the text of Handbook 385, which

directs SWAs to employ "probability sampling methods." ECF No. 30-3 at 4.

The role of judicial review under the APA is not to search for a superior alternative to agency action. Instead, the Court gives great deference to "an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise," such as ESD's selection of the statistical models it applied. *Allen*, 615 F.3d at 1130 (quoting *McNair*, 537 F.3d at 987). At this stage, Plaintiffs have done no more than present a "specialist[] [who] express[es] conflicting views." *Marsh*, 490 U.S. 378. DOL has discretion, however, "to rely on the reasonable opinions of its own qualified experts," such as Mr. Moll, "even if, as an original matter, a court might find contrary views more persuasive." *Id.* Mindful of the principle that the Court does not "substitute [its] judgment for that of the agency," the record at this stage is insufficient to find that Plaintiffs are likely to prevail on the merits of this argument. *Allen*, 615 F.3d at 1130 (quoting *McNair*, 537 F.3d at 987).

### c.    Failure to Conduct In-Person Interviews

Plaintiffs' final argument, that ESD failed to conduct in-person interviews, is also insufficient to warrant preliminary relief. The parties agree that ESD conducted zero in-person interviews in calculating the PWR. ECF No. 30 at 8–9. DOL and ESD argue that Handbook 385 affords SWAs freedom to deviate from the in-person interview requirement, and that ESD's limited manpower made it necessary to do

so. ECF No. 31 at 21–22. Handbook 385 dictates that under "certain conditions, employer contacts by mail or by telephone may be made" if "the [SWA] assure[s] itself that information gathered in this manner is representative." ECF No. 30-3 at 6. But the Handbook does not suggest under what conditions this exception would apply, and neither DOL nor ESD make a compelling attempt to interpret this provision for the Court. The agencies also rely on guidance distributed to SWAs which can be read to suggest that an SWA forced to "prioritize[] its limited resources" may rely on alternative survey means such as telephone contacts as long as doing so "will yield statistically valid wage findings." ECF No. 30-2 at 20. Neither of these arguments convincingly rebuts Plaintiffs' argument that the failure to conduct in-person interviews could render the resulting PWR arbitrary or capricious. *See Acosta*, 901 F.3d at 387 ("An agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable."); *see also Yueh-Shaio Yang*, 519 U.S. at 32.

However, Plaintiffs have not established how the failure to conduct in-person interviews resulted in an artificially inflated PWR—in short, they lack evidence of causation. Plaintiffs' complaint merely states that had ESD conducted in-person interviews, "the resulting PWR . . . would have been substantially lower than $16.00 per hour." ECF No. 1 at 35. But Plaintiffs make no attempt to substantiate this claim. In the *Zirkle* litigation, the Plaintiff argued that conducting in-person

interviews would have resulted in ESD making contact with a more representative sample of blueberry growers, and the Court concluded that this argument was "plausible." Case No. 1:19-cv-03180-SMJ, ECF No. 49 at 18. But in that case the Court only required evidence of "serious questions going to the merits," and here Plaintiffs face a more onerous burden. *Id.* Because they have failed to make a persuasive showing of causation, the Court concludes that they have failed to make the required showing of likelihood of success on the merits of this claim.

### 3. Irreparable Injury & Public Interest

Because the Court finds that Plaintiffs have failed to make the required showing that they are likely to succeed on the merits, a preliminary injunction is not warranted. Thus, the Court does not evaluate the remaining two *Winter* factors.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have failed to establish a likelihood of success on the merits of any of their claims that DOL's certification of the PWR calculated by ESD was arbitrary or capricious. The requested preliminary injunction is therefore unwarranted.

Accordingly, **IT IS HEREBY ORDERED**:

**1.** Plaintiffs' Motion for Preliminary Injunction, **ECF No. 15**, is **DENIED**.

1    **IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and

2  provide copies to all counsel.

3       **DATED** this 11th day of October 2019.

4       _____
        SALVADOR MENDOZA, JR.
5       United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION **-** 21